United States District Court
Middle District of Florida
Tampa Division

**MELANIE HIGGINS,**

*Plaintiff,*

v.                                                                    **NO. 8:23-cv-1425-PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

*Defendant.*

_____

## Order

Melanie Higgins challenges a final decision by the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income. Doc. 1. She argues that the administrative law judge (ALJ) erred in three ways and that each error warrants reversal and an award of benefits or remand. Doc. 23. The Commissioner disagrees. Doc. 25. The procedural history is summarized in the parties' briefs, Docs. 23, 25, and not repeated here.

## I.      Standard of Review

A court's review of a decision by the Commissioner is limited to whether substantial evidence supports the factual findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoted authority omitted).

## II.   Law and Analysis

### A.   *The ALJ's Evaluation of Higgins's Subjective Testimony*

Focusing on her severe impairment of fibromyalgia (FM), *see* Tr. 16, Higgins argues that the ALJ erred in evaluating her subjective testimony under Social Security Ruling (SSR) 16-3p by placing an undue emphasis on the absence of objective findings and by failing to use the framework in SSR 12-2p to evaluate her complaints. Doc. 23 at 15–17.

SSR 16-3p is a policy interpretation ruling on how the Social Security Administration (SSA) evaluates symptoms. The ruling explains a two-step process. SSR 16-3p. At step one, the SSA determines whether the claimant has a medically determinable impairment (MDI) "that could reasonably be expected to produce the [claimant's] alleged symptoms." *Id.* At step two, the SSA evaluates "the intensity and persistence of … symptoms such as pain and determine[s] the extent to which [a claimant]'s symptoms limit … her ability to perform work-related activities." *Id.* About step two, the ruling explains:

> Once the existence of [an MDI] that could reasonably be expected to produce pain or other symptoms is established, we recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

2

> We will not evaluate … symptoms without making every reasonable effort to obtain a complete medical history unless the evidence supports a finding that the individual is disabled. We will not evaluate … symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled.

*Id.* (footnote omitted).

SSR 16-3p explains how the SSA considers objective medical evidence in the evaluation of symptoms:

> Symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques. However, objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities …. We must consider whether an individual's statements about the intensity, persistence, and limiting effects of … her symptoms are consistent with the medical signs and laboratory findings of record.

> The intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence. Examples such as reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, the symptom of pain. These findings may be consistent with an individual's statements about symptoms and their functional effects. However, when the results of tests are not consistent with other evidence in the record, they may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with other evidence in the record.

> …

> [W]e will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual. A report of minimal or negative findings or inconsistencies in the objective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms.

*Id.* (footnotes omitted).

SSR 16-3p explains how the SSA considers other evidence in the evaluation of symptoms:

> If we cannot make a disability … decision that is fully favorable based solely on objective medical evidence, then we carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms. Other evidence … includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors … in our regulations. …
>
> **a. The Individual**
>
> An individual may make statements about the intensity, persistence, and limiting effects of … her symptoms. … For an adult whose impairment prevents … her from describing symptoms adequately, we may also consider a description of … her symptoms from a person who is familiar with the individual.
>
> An individual may make statements about symptoms directly to medical sources, other sources, or ... she may make them directly to us. …
>
> An individual's statements may address the frequency and duration of the symptoms, the location of the symptoms, and the impact of the symptoms on the ability to perform daily living activities. An individual's statements may also include activities that precipitate or aggravate the symptoms, medications and treatments used, and other methods used to alleviate the symptoms. We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.
>
> **b. Medical Sources**
>
> Medical sources may offer diagnoses, prognoses, and opinions as well as statements and medical reports about an individual's history, treatment, responses to treatment, prior work record, efforts to work,

4

daily activities, and other information concerning the intensity, persistence, and limiting effects of an individual's symptoms.

Important information about symptoms recorded by medical sources and reported in the medical evidence may include, but is not limited to, the following:

- Onset, description of the character and location of the symptoms, precipitating and aggravating factors, frequency and duration, change over a period of time (e.g., whether worsening, improving, or static), and daily activities. Very often, the individual has provided this information to the medical source, and the information may be compared with the individual's other statements in the case record. In addition, the evidence provided by a medical source may contain medical opinions about the individual's symptoms and their effects. …

- A longitudinal record of any treatment and its success or failure, including any side effects of medication.

- Indications of other impairments, such as potential mental impairments, that could account for an individual's allegations.

Medical evidence from medical sources that have not treated or examined the individual is also important in the adjudicator's evaluation of an individual's statements about pain or other symptoms. For example, State agency medical and psychological consultants and other program physicians and psychologists may offer findings about the existence and severity of an individual's symptoms. We will consider these findings in evaluating the intensity, persistence, and limiting effects of the individual's symptoms. …

### c. Non-Medical Sources

Other sources may provide information from which we may draw inferences and conclusions about an individual's statements that would be helpful to us in assessing the intensity, persistence, and limiting effects of symptoms. Examples of such sources include public and private agencies, other practitioners, educational personnel, non-medical sources such as family and friends, and agency personnel. We will consider any statements in the record noted by agency personnel who previously interviewed the individual …. The adjudicator will

5

consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about … her symptoms as well as with all of the evidence in the file.

### d. Factors To Consider in Evaluating the Intensity, Persistence, and Limiting Effects of an Individual's Symptoms

In addition to using all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors … in 20 CFR 404.1529(c)(3) and 416.929(c)(3). These factors include:

1. Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms …; and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

We will consider other evidence to evaluate only the factors that are relevant to assessing the intensity, persistence, and limiting effects of the individual's symptoms. If there is no information in the evidence of record regarding one of the factors, we will not discuss that specific factor in the determination or decision because it is not relevant to the case. We will discuss the factors pertinent to the evidence of record.

*Id.* (footnote omitted).

SSR 16-3p explains how the SSA will determine how a claimant's symptoms will affect her ability to perform work-related activities:

> If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, we will determine that the individual's symptoms are more likely to reduce … her capacities to perform work-related activities …. In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce ... her capacities to perform work-related activities ….
>
> We may or may not find an individual's symptoms and related limitations consistent with the evidence in ... her record. We will explain which of an individual's symptoms we found consistent or inconsistent with the evidence in ... her record and how our evaluation of the individual's symptoms led to our conclusions. We will evaluate an individual's symptoms considering all the evidence in ... her record.
>
> In determining whether an individual's symptoms will reduce ... her corresponding capacities to perform work-related activities …, we will consider the consistency of the individual's own statements. To do so, we will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances.
>
> We will consider statements an individual made to us at each prior step of the administrative review process, as well as statements the individual made in any subsequent or prior disability claims …. If an individual's various statements about the intensity, persistence, and limiting effects of symptoms are consistent with one another and consistent with the objective medical evidence and other evidence in the record, we will determine that an individual's symptoms are more likely to reduce ... her capacities for work-related activities or reduce the abilities to function independently, appropriately, and effectively in an age- appropriate manner. However, inconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time. This may

7

explain why an individual's statements vary when describing the intensity, persistence, or functional effects of symptoms.

We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities .... Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.

In contrast, if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons ... she may not comply with treatment or seek treatment consistent with the degree of ... her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why ... she has not complied with or sought treatment in a manner consistent with ... her complaints. When we consider the individual's treatment history, we may consider ... one or more of the following:

- An individual may have structured ... her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate ... her symptoms.

- An individual may receive periodic treatment or evaluation for refills of medications because ... her symptoms have reached a plateau.

- An individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms.

- An individual may not be able to afford treatment and may not have access to free or low-cost medical services.

8

- A medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual.

- An individual's symptoms may not be severe enough to prompt him or her to seek treatment, or the symptoms may be relieved with over the counter medications.

- An individual's religious beliefs may prohibit prescribed treatment.

- Due to various limitations (such as language or mental limitations), an individual may not understand the appropriate treatment for or the need for consistent treatment of ... her impairment.

- Due to a mental impairment (for example, individuals with mental impairments that affect judgment, reality testing, or orientation), an individual may not be aware that ... she has a disorder that requires treatment.

*Id.* (footnotes and emphases omitted).

SSR 16-3p explains how the SSA will use its evaluation of symptoms in the five-step sequential evaluation process used to determine disability:

> In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about ... her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.
>
> Our adjudicators must base their findings solely on the evidence in the case record .... The subjective statements of the individual and

witnesses obtained at a hearing should directly relate to symptoms the individual alleged. …

Adjudicators must limit their evaluation to the individual's statements about ... her symptoms and the evidence in the record that is relevant to the individual's impairments. In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether ... she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes [an MDI] that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities ….

In determining whether an individual is disabled or continues to be disabled, our adjudicators follow a sequential evaluation process. The first step … considers whether an individual is performing substantial gainful activity. … We do not consider symptoms at the first step ....

At step 2 …, we determine whether an individual has a severe medically determinable physical or mental impairment or combination of impairments that has lasted or can be expected to last for a continuous period of at least 12 months or end in death. …

At step 3 …, we determine whether an individual's impairment(s) meets or medically equals the severity requirements of a listed impairment. To decide whether the impairment meets the level of severity described in a listed impairment, we will consider an individual's symptoms when a symptom(s) is one of the criteria in a listing to ensure the symptom is present in combination with the other criteria. If the symptom is not one of the criteria in a listing, we will not evaluate an individual's symptoms at this step as long as all other findings required by the specific listing are present. Unless the listing states otherwise, it is not necessary to provide information about the intensity, persistence, or limiting effects of a symptom as long as all other findings required by the specific listing are present. In considering whether an individual's symptoms, signs, and laboratory findings are medically equal to the symptoms, signs, and laboratory findings of a listed impairment, we will look to see whether the symptoms, signs, and laboratory findings are at least equal in severity to the listed criteria. However, we will not substitute the

10

individual's allegations of pain or other symptoms for a missing or deficient sign or laboratory finding to raise the severity of the impairment(s) to that of a listed impairment. …

…

If the individual's impairment does not meet or equal a listing, we will assess and make a finding about an individual's [RFC] based on all the relevant medical and other evidence in the individual's case record. … We consider the individual's symptoms when determining ... her [RFC] and the extent to which the individual's impairment-related symptoms are consistent with the evidence in the record.

After establishing the [RFC], we determine whether an individual is able to do any past relevant work. …

At step 5 …, we determine whether the individual is able to adjust to other work that exists in significant numbers in the national economy. We consider the same [RFC], together with the individual's age, education, and past work experience. … At step 5 …, we will not consider an individual's symptoms any further because we considered the individual's symptoms when we determined the … [RFC].

SSR16-3p (footnotes omitted).

SSR 12-2p is a policy interpretation ruling on how the SSA evaluates FM. In an introduction, the ruling explains:

FM is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months. FM is a common syndrome. When a person seeks disability benefits due in whole or in part to FM, we must properly consider the person's symptoms when we decide whether the person has an MDI of FM. As with any claim for disability benefits, before we find that a person with an MDI of FM is disabled, we must ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes … her from performing any substantial gainful activity.

11

SSR 12-2p (footnote omitted).

SSR 12-2p explains the circumstances under which FM is an MDI:

FM is an MDI when it is established by appropriate medical evidence. FM can be the basis for a finding of disability.

…Generally, a person can establish that ... she has an MDI of FM by providing evidence from an acceptable medical source. A licensed physician (a medical or osteopathic doctor) is the only acceptable medical source who can provide such evidence. We cannot rely upon the physician's diagnosis alone. The evidence must document that the physician reviewed the person's medical history and conducted a physical exam. We will review the physician's treatment notes to see if they are consistent with the diagnosis of FM, determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities.

…We will find that a person has an MDI of FM if the physician diagnosed FM and provides the evidence we describe …, and the physician's diagnosis is not inconsistent with the other evidence in the person's case record. … If we cannot find that the person has an MDI of FM but there is evidence of another MDI, we will not evaluate the impairment under this Ruling. Instead, we will evaluate it under the rules that apply for that impairment.

*Id.* (footnote omitted).

SSR 12-2p details one set of criteria for finding that a person has an MDI of FM, explaining that all three criteria must be present:

1. A history of widespread pain—that is, pain in all quadrants of the body … and axial skeletal pain …—that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present.

12

2. At least 11 positive tender points on physical examination …. The positive tender points must be found bilaterally … and both above and below the waist.

…

3. Evidence that other disorders that could cause the symptoms or signs were excluded. Other physical and mental disorders may have symptoms or signs that are the same or similar to those resulting from FM. Therefore, it is common in cases involving FM to find evidence of examinations and testing that rule out other disorders that could account for the person's symptoms and signs. Laboratory testing may include imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor).

*Id.* (footnote omitted).

SSR 12-2p details a second set of criteria for finding that a person has an MDI of FM, explaining that all three criteria must be present:

1. A history of widespread pain …;

2. Repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and

3. Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded ….

*Id.* (footnotes omitted).

SSR 12-2p explains the documentation that is necessary:

As in all claims for disability benefits, we need objective medical evidence to establish the presence of an MDI. When a person alleges FM, longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in

13

establishing both the existence and severity of the impairment. In cases involving FM, … we will make every reasonable effort to obtain all available, relevant evidence to ensure appropriate and thorough evaluation.

…We will generally request evidence for the 12-month period before the date of application unless we have reason to believe that we need evidence from an earlier period, or unless the alleged onset of disability is less than 12 months before the date of application. In the latter case, we may still request evidence from before the alleged onset date if we have reason to believe that it could be relevant to a finding about the existence, severity, or duration of the disorder, or to establish the onset of disability.

…

…In addition to obtaining evidence from a physician, we may request evidence from other acceptable medical sources, such as psychologists, both to determine whether the person has another MDI(s) and to evaluate the severity and functional effects of FM or any of the person's other impairments. We also may consider evidence from medical sources who are not "acceptable medical sources" to evaluate the severity and functional effects of the impairment(s).

…[I]nformation from nonmedical sources can also help us evaluate the severity and functional effects of a person's FM. This information may help us to assess the person's ability to function day-to-day and over time. It may also help us when we make findings about the credibility of the person's allegations about symptoms and their effects. Examples of nonmedical sources include: … Neighbors, friends, relatives, and clergy; … Past employers, rehabilitation counselors, and teachers; and … Statements from SSA personnel who interviewed the person.

*Id.* (footnotes omitted).

SSR 12-2p explains how the SSA evaluates a person's statements about her symptoms and functional limitations:

We follow the two-step process set forth in our regulations ….

A. *First step of the symptom evaluation process*. There must be medical signs and findings that show the person has an MDI(s) which could reasonably be expected to produce the pain or other symptoms alleged. FM which we determined to be an MDI satisfies the first step of our two-step process for evaluating symptoms.

B. *Second step of the symptom evaluation process*. Once an MDI is established, we then evaluate the intensity and persistence of the person's pain or any other symptoms and determine the extent to which the symptoms limit the person's capacity for work. If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms. ... [W]e will make a finding about the credibility of the person's statements regarding the effects of ... her symptoms on functioning. We will make every reasonable effort to obtain available information that could help us assess the credibility of the person's statements.

*Id.* (emphasis added).

SSR 12-2p explains how the SSA considers FM in the five-step sequential evaluation process:

Once we establish that a person has an MDI of FM, we will consider it in the sequential evaluation process to determine whether the person is disabled. ... [W]e consider the severity of the impairment, whether the impairment medically equals the requirements of a listed impairment, and whether the impairment prevents the person from doing ... her past relevant work or other work that exists in significant numbers in the national economy.

...

A. At step 1, we consider the person's work activity. If a person with FM is doing substantial gainful activity, we find that ... she is not disabled.

15

B. At step 2, we consider whether the person has a "severe" MDI(s). If we find that the person has an MDI that could reasonably be expected to produce the pain or other symptoms the person alleges, we will consider those symptom(s) in deciding whether the person's impairment(s) is severe. If the person's pain or other symptoms cause a limitation or restriction that has more than a minimal effect on the ability to perform basic work activities, we will find that the person has a severe impairment(s).

C. At step 3, we consider whether the person's impairment(s) meets or medically equals the criteria of any of the listings in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (appendix 1). FM cannot meet a listing … because FM is not a listed impairment. At step 3, therefore, we determine whether FM medically equals a listing …, or whether it medically equals a listing in combination with at least one other [MDI].

D. … RFC … assessment: In our regulations and SSR 96-8p, we explain that we assess a person's RFC when the person's impairment(s) does not meet or equal a listed impairment. We base our RFC assessment on all relevant evidence in the case record. We consider the effects of all of the person's [MDI]s, including impairments that are "not severe." For a person with FM, we will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have "bad days and good days."

E. At steps 4 and 5, we use our RFC assessment to determine whether the person is capable of doing any past relevant work (step 4) or any other work that exists in significant numbers in the national economy (step 5). … The usual vocational considerations apply.

1. Widespread pain and other symptoms associated with FM, such as fatigue, may result in exertional limitations that prevent a person from doing the full range of unskilled work in one or more of the exertional categories …. People with FM may also have nonexertional physical or mental limitations because of their pain or other symptoms. Some may have environmental restrictions, which are also nonexertional.

2. Adjudicators must be alert to the possibility that there may be exertional or nonexertional (for example, postural or environmental) limitations that erode a person's occupational base sufficiently to preclude the use of a rule in appendix 2 to direct a decision. In such

16

cases, adjudicators must use the rules in appendix 2 as a framework for decision-making and may need to consult a vocational resource.

*Id.* (footnotes omitted).

In this case, the ALJ explained that she was evaluating Higgins's FM consistent with SSR 12-2p. Tr. 18. The ALJ observed that Robert Levin, M.D., had diagnosed Higgins with FM. Tr. 18. The ALJ stated the criteria for determining whether a claimant has an MDI of FM. Tr. 18. The ALJ applied the criteria to the record, explaining, "However, the record indicates that repeated physical examinations showed some trigger point tenderness but there was no pain with range of motion in [Higgins]'s wrists, elbows, shoulders, cervical spine, hips, knees, ankles, feet, or hands …. Her motor strength was normal and sensation intact for light touch."* Tr. 18.

For the RFC, the ALJ found Higgins can perform light work with additional limitations:

- She must be permitted "to sit or stand alternately for a brief change in position every 15–30 minutes while remaining on task."

- She "must never crawl or climb ladders, ropes, or scaffolds."

- "She is limited to occasional stooping, crouching, kneeling, and climbing of ramps or stairs."

- "She is limited to frequent reaching in all directions with the right upper extremity."

---

*State agency medical consultants found no FM impairment. Tr. 92, 101, 111, 122. The Commissioner does not argue that Higgins fails to meet the criteria for FM. *See* Doc. 25. Whether she does is unnecessary to deciding the issues she raises.

17

- "She is limited to frequent handling, fingering, and feeling on the right, in a right-hand dominant person."

- She "must never operate dangerous machinery or be exposed to unprotected heights."

- "She is limited to occasional exposure to extreme cold, industrial vibration, and a noise level above modern office setting[.]"

- "In addition to regularly scheduled breaks, [she] would be off-task up to 10% of the time during an 8-hour workday due to possible need for increased restroom usage."

Tr. 19.

The ALJ explained that, in assessing the RFC, she had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p," and she summarized the two-step process explained in SSR 16-3p. Tr. 19–20.

The ALJ summarized Higgins's statements in documents submitted with her applications and Higgins's testimony at the administrative hearing:

> [Higgins] alleges disability due to scoliosis, herniated spinal discs, osteoarthritis, fibromyalgia, degenerative disc disease, sciatica, peripheral neuropathy, migraines, bowel obstruction, and uterine prolapse (Ex. 2E). In a report, [Higgins] indicated that most of her pain is in her back (Ex. 3E). She said that she has pain from the moment she wakes up until she falls asleep. She said that she has had chronic migraines since childhood. [She] stated that she finds it difficult to get through daily chores, including self-care some days. She indicated that she is unable to sit or stand for long or lift much. [She] offered similar testimony at [the] hearing. According to her testimony, she had a uterine prolapse after the birth of her daughter in 2014. She said she also experience bathroom emergencies all day every day due to irritable

bowel syndrome and fibromyalgia. She said she began going to a pain management specialist due to abdominal and joint pain. She stated that she is unable to sit and must be in a reclining position most of the day. [She] said that she can stand/walk no more than five minutes at one time and sit less than five minutes at one time. Finally, [she] testified that she is not under the care of a mental health specialist, nor does she take medication for mental health symptoms.

Tr. 20.

At the first step described in SSR 16-3p, the ALJ explained, "After careful consideration of the evidence, the undersigned finds that [Higgins]'s [MDI]s could reasonably be expected to cause the alleged symptoms" but "[Higgins]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" Tr. 20.

The ALJ made the following observations and findings.

- Higgins visited the emergency room many times for various symptoms, including headaches, abdominal pain, back pain, and a finger laceration, but was considered stable and discharged after "conservative interventions." Tr. 20.

- Higgins receives regular treatment for neck and back pain, and objective tests establish severe impairments of her lumbar and cervical spine. Still, her treating orthopedist noted Higgins has "no clear surgical indications" and does not want surgery for her neck and back pain. Tr. 21.

- In July 2021, Higgins reported noticing right shoulder pain beginning a month before the visit after using tree branches to pull herself on a hiking trail. Tr. 21. The activity is inconsistent with Higgins's testimony that she cannot walk more than five minutes at a time and spends most days reclining. Tr. 21. Higgins testified

19

she had a right torn rotator cuff, but an x-ray of her right shoulder was unremarkable. Tr. 21.

- Higgins received epidural steroid injections and prescription pain medication from a pain-management specialist and underwent cervical radiofrequency ablation and branch blocks. Tr. 21. She reported that the steroid injections provided relief for only days. Tr. 21. Treatment records indicate that she underwent "a two medial branch block at L34, L4-5, and L5-S1 in August and September 2021, which provided 80% relief of her pain," and "cervical facet injections in late 2021." Tr. 21. In December 2021, she "reported she was doing well." Tr. 21. In March 2022, she continued to complain about cervical and back pain but reported a pain level of only five out of ten. Tr. 21. She "had a normal appearance with pain on palpation and reduced range of motion" but a negative straight-leg-raising test bilaterally and intact sensation "to light touch of the bilateral lower extremities." Tr. 21.

- Higgins visited the emergency room multiple times for headaches but was treated and released each time, indicating medication adequately treated the headaches. Tr. 21. During a March 2019 emergency room visit, she explained that she had run out of medication, and during a March 2021 visit, that she had stopped taking her FM medication and now had a headache and body pain. Tr. 21–22. She sought treatment for migraines from a neurologist, and the neurologist prescribed medication. Tr. 22. She reported having experienced headaches since she was young, but she nevertheless worked for many years. Tr. 22. April 2021 neurological treatment records show she had not visited since July 2019 and reported significant improvement with medication. Tr. 22. "Repeated neurological examinations showed no abnormalities of memory/recall/concentration," "motor strength of 5/5 with normal bulk and tone," independent "gait and station," and "no spine tenderness." Tr. 22.

- July 2019 progress notes from Tampa Bay Surgical Group describe an MRI showing "mild pelvic floor relaxation and pelvic hiatal enlargement and descent as well as mild rectal prolapse." Tr. 22.

20

Higgins did not follow up for two years. Tr. 22. She returned in May 2021, discussed "a dynamic MRI and colonoscopy," and underwent a colonoscopy at the request of gastroenterologist Satish Patel, M.D., "which was generally unremarkable with no evidence of colitis[.]" Tr. 22. Dr. Patel noted that surgical options would be explored after the tests were performed, but Higgins did not return. Tr. 22. She went to the emergency room after the colonoscopy with complaints of abdominal pain. Tr. 22. She stated that she had undergone multiple colonoscopies but that no treating physician could find a reason for her chronic diarrhea. Tr. 22. A computed tomography (CT) scan of her abdomen was benign. Tr. 22.

- Dr. Levin treated Higgins for FM. Tr. 22. "Repeated physical examinations showed some trigger point tenderness but there was no pain with range of motion in [Higgins]'s wrists, elbows, shoulders, cervical spine, hips, knees, ankles, feet, or hands" and "[h]er motor strength was normal and sensation intact for light touch." Tr. 22. Rodney Daniel, M.D., "reported that all 28 joints were normal and no pain with range of motion" and that Higgins "displayed intact sensation, normal motor strength, and did not appear uncomfortable." Tr. 22. Dr. Daniel diagnosed her with hypermobility arthralgia. Tr. 22. "Despite physical examinations showing intact sensation," her primary care physician, Beverly Encarnacion, M.D., diagnosed her with peripheral neuropathy secondary to stenosis. Tr. 22. Physical examinations by Dr. Encarnacion "showed widespread/joint muscle pain with stable range of motion and unremarkable neurologic findings." Tr. 22. In April 2021, Dr. Encarnacion noted that Higgins saw a pain-management specialist but since had "tapered off all opioids and declined all surgical suggestions." Tr. 22–23.

- Dr. Encarnacion diagnosed Higgins with generalized anxiety disorder and, in 2017, Higgins's pain-management specialist noted "that he suspected [Higgins] has significant myofascial pain, overlying anxiety, and likely depression." Tr. 23. But Higgins has not seen a mental-health specialist; has not been prescribed medication for mental health; has repeatedly denied anxiety

attacks, mood disorder, depression, or panic problems; and did not allege mental impairments in her applications. Tr. 23.

- Higgins has severe physical impairments that are not disabling, even in combination with each other. Tr. 23. The radiological evidence of her cervical and lumbar spines "show that a limitation to light work with certain postural restrictions is appropriate." Tr. 23. The imaging showed "positive findings," but the physical examinations repeatedly showed she had a normal range of motion in all joints. Tr. 23. She testified she had not been prescribed an assistive device for ambulation. Tr. 23. Her headaches appear stable when she complies with treatment and takes prescribed medication. Tr. 23. To accommodate her headaches and potential FM pain, hypermobility arthralgia, and peripheral neuropathy, the RFC includes a limitation to occasional exposure to extreme cold, industrial vibration, and a noise level above modern office setting. Tr. 23. The sit-stand option also addresses pain. Tr. 23. Based on the diagnosis of rectocele and her subjective complaints about chronic diarrhea, she would be off-task up to ten percent of the time during an 8-hour workday "due to possible need for increased restroom usage." Tr. 23. To account for shoulder pain, the ALJ provided limitations on Higgins's right upper extremity. Tr. 23.

- Although Higgins testified that she spends most of her time in a reclining position, she admitted that she regularly attends church, can prepare simple meals, and can drive. Tr. 23. The treatment records show she hiked at least once. Tr. 23. She admitted that she can perform personal care. Tr. 23. During office visits, she reported that she was involved in a relationship and had experienced significant improvement with her pelvic floor. Tr. 23. She testified she has a Roomba, and her eight-year-old child helps with household chores. Tr. 23. Her activities of daily living indicate that she "is more capable than alleged." Tr. 24.

- That neither Higgins nor her representative offered any opinion from a medical source to support her allegations despite her visits to multiple medical specialists is notable. Tr. 24.

- State agency medical consultants Bettye Stanley, D.O., and Stephen Bradley, M.D., opined that Higgins can perform a reduced range of light work, and the ALJ concurs. Tr. 24. Dr. Bradley adopted Dr. Stanley's findings but added limitations for reaching with the right upper extremity. Tr. 24. The ALJ imposed more significant restrictions, viewing the record "in the light most favorable to" Higgins. Tr. 24.

- The state agency psychological consultants found Higgins's mental impairments non-severe, and no evidence "departs from these findings." Tr. 24. She has not sought mental health treatment from a mental health specialist, has not been prescribed psychotropic medication, and has repeatedly denied mental-health symptoms to treating providers. Tr. 24.

The ALJ concluded, "In sum, the … [RFC] assessment is supported by the clinical findings, treatment records, and medical opinion evidence. The [RFC] also fully considered [Higgins]'s subjective reports." Tr. 24.

Contrary to Higgins's argument, the ALJ properly evaluated her subjective testimony under SSR 16-3p and SSR 12-2p and the laws underlying those rulings. Under SSR 12-2p, the ALJ had to consider both objective evidence and other evidence when evaluating Higgins's FM. The ALJ found the objective medical evidence did not substantiate the extreme limitations Higgins alleged, like having to be in a reclining position all day, and substantial evidence supports that finding. *See, e.g.*, Tr. 722, 728, 734, 740, 745, 751, 756, 761, 767, 773, 859, 873, 879, 900–01, 924, 938–39, 955–56, 983, 997, 1015–16, 1067–68, 1086-87, 1241, 1246, 1251, 1257, 1267, 1273–74, 1279–80. The ALJ accordingly considered other evidence. Tr. 23–24. The ALJ found that the other evidence likewise did not substantiate the extreme limitations Higgins alleged, like evidence that Higgins hiked at least once, went to church,

23

lived independently, took care of her personal care, and was in a relationship, and substantial evidence supports that finding. *See, e.g.*, Tr. 67, 69–71, 806, 815–16. The ALJ considered the objective evidence as required, *see* SSR 12-2p, but did not over-rely on the objective evidence as Higgins argues. As the Commissioner observes, while SSR 12-2p explains that symptoms from FM are not always observable upon an objective examination, a mere diagnosis of FM does not mean per se disability. *See* Doc. 25 at 6. Instead, like other impairments, FM symptoms may or may not be disabling, depending on the person. *Id.*

Higgins fails to show error in the ALJ's evaluation of her subjective testimony and other statements.

## B.   *The Off-Task Limitation in the RFC*

Higgins argues the RFC is not supported by substantial evidence because the ALJ found that she would be off task ten percent of the workday without medical support or an explanation, in violation of SSR 96-8p. Doc. 23 at 18–22.

SSR 96-8p is a policy interpretation ruling on assessing the RFC in initial claims. The ruling states this purpose:

> To state the [SSA]'s policies and policy interpretations regarding the assessment of … RFC … in initial claims for disability benefits under titles II and XVI of the Social Security Act (the Act). In particular, to emphasize that:
>
> Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting

on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

The RFC assessment considers only functional limitations and restrictions that result from an individual's [MDI] or combination of impairments, including the impact of any related symptoms. Age and body habitus are not factors in assessing RFC. It is incorrect to find that an individual has limitations beyond those caused by ... her [MDI](s) and any related symptoms, due to such factors as age and natural body build, and the activities the individual was accustomed to doing in ... her previous work.

When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.

The RFC assessment must first identify the individual's functional limitations or restrictions and assess ... her work-related abilities on a function-by-function basis …. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

RFC is not the least an individual can do despite … her limitations or restrictions, but the most.

Medical impairments and symptoms, including pain, are not intrinsically exertional or nonexertional. It is the functional limitations or restrictions caused by medical impairments and their related symptoms that are categorized as exertional or nonexertional.

*Id.* (internal numbering & emphases omitted).

SSR 96-8p explains the RFC assessment:

When an individual is not engaging in substantial gainful activity and a determination or decision cannot be made on the basis of medical factors alone (i.e., when the impairment is severe because it has more than a minimal effect on the ability to do basic work activities yet does not meet or equal in severity the requirements of any impairment in the

25

Listing of Impairments), the sequential evaluation process generally must continue with an identification of the individual's functional limitations and restrictions and an assessment of ... her remaining capacities for work-related activities. This assessment of RFC is used at step 4 … to determine whether an individual is able to do past relevant work, and at step 5 to determine whether an individual is able to do other work, considering ... her age, education, and work experience.

*Id.* (footnote omitted).

SSR 96-8p provides this definition of RFC:

RFC is what an individual can still do despite … her limitations. RFC is an administrative assessment of the extent to which an individual's [MDI](s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect … her capacity to do work-related physical and mental activities. … Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. RFC does not represent the least an individual can do despite ... her limitations or restrictions, but the most. RFC is assessed by adjudicators … based on all of the relevant evidence in the case record, including information about the individual's symptoms and any "medical source statements" -- i.e., opinions about what the individual can still do despite ... her impairment(s)-- submitted by an individual's treating source or other acceptable medical sources.

*Id.* (footnotes & emphases omitted).

SSR 96-8p cautions that the RFC must be based only on the claimant's impairments:

The Act requires that an individual's inability to work must result from the individual's physical or mental impairment(s). Therefore, in assessing RFC, the adjudicator must consider only limitations and restrictions attributable to [MDI]s. It is incorrect to find that an

26

individual has limitations or restrictions beyond those caused by ... her medical impairment(s) including any related symptoms, such as pain, due to factors such as age or height, or whether the individual had ever engaged in certain activities in ... her past relevant work (e.g., lifting heavy weights.) Age and body habitus (i.e., natural body build, physique, constitution, size, and weight, insofar as they are unrelated to the individual's [MDI](s) and related symptoms) are not factors in assessing RFC in initial claims.

*Id.* (footnote & emphases omitted).

SSR 96-8p explains what evidence is considered in determining the RFC:

The RFC assessment must be based on all of the relevant evidence in the case record, such as:

- Medical history,

- Medical signs and laboratory findings,

- The effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication),

- Reports of daily activities,

- Lay evidence,

- Recorded observations,

- Medical source statements,

- Effects of symptoms, including pain, that are reasonably attributed to [an MDI],

- Evidence from attempts to work,

- Need for a structured living environment, and

27

- Work evaluations, if available.

The adjudicator must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC. Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone.

In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim.

*Id.* (emphasis omitted).

SSR 96-8p explains that the RFC assessment must be explained:

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week …), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Symptoms.* In all cases in which symptoms, such as pain, are alleged, the RFC assessment must:

- Contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;

28

- Include a resolution of any inconsistencies in the evidence as a whole; and

- Set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.

The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence. In instances in which the adjudicator has observed the individual, ... she is not free to accept or reject that individual's complaints solely on the basis of such personal observations. ...

*Medical opinions.* The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

*Id.* (footnote & emphasis omitted).

In this case, the ALJ explained that the off-task limitation to account for a possible need for increased restroom usage was based on the rectocele diagnosis and Higgins's subjective complaints about chronic diarrhea. Tr. 23. The ALJ observed that Higgins claimed that she has bathroom emergencies all day every day, Tr. 20, but found the statement inconsistent with other evidence, such as Higgins's failure to follow-up with Tampa Bay Surgical Group between her July 2019 and May 2021 visits, failure to return to Tampa Bay Surgical Group or Dr. Patel to explore surgical options, generally unremarkable findings from her colonoscopy, the benign CT scan of her abdomen, and her activities of daily living. Tr. 20, 22–23. The ALJ observed that neither Dr. Stanley nor Dr. Bradley opined she needed a limitation to account for bathroom emergencies. Tr. 24; *see* Tr. 94, 103, 113–14, 124–25. The ALJ observed that, despite Higgins's visits to many specialists, neither Higgins

29

nor her representative offered any opinion from a medical source to support her allegations. Tr. 24. Although the ALJ did not detail why she chose ten percent of an eight-hour workday in addition to regularly scheduled breaks, she made clear that she was choosing this number by viewing the evidence in a light most favorable to Higgins. *See* Tr. 24. As the Commissioner observes, Higgins cites no evidence the ALJ overlooked to support that Higgins had to be off task more than ten percent of an eight-hour workday in addition to regularly scheduled breaks. *See* Doc. 25 at 7–8.

Regarding the ALJ's off-task finding or explanation of the finding, Higgins fails to show legal error or the absence of substantial evidence supporting the RFC.

### C.    *The ALJ's Findings at Step Three*

Higgins argues that the ALJ erred at step three of the sequential evaluation process under SSR 12-2p and SSR 19-4p by failing to evaluate whether her FM medically equaled Listing 14.09 (inflammatory arthritis) and whether her severe headache disorder medically equaled Listing 11.02 (epilepsy). Doc. 23 at 22–25.

SSR 19-4p is a policy interpretation ruling on how the SSA evaluates cases involving primary headache disorders. The ruling explains:

> Primary headache disorders are among the most common disorders of the nervous system. Examples of these disorders include migraine headaches, tension-type headaches, and cluster headaches. We are issuing this SSR to explain our policy on how we establish that a person has an MDI of a primary headache disorder and how we evaluate primary headache disorders in disability claims. In 2018, the Headache

30

Classification Committee of the International Headache Society published the third edition of the International Classification of Headache Disorders (ICHD-3). The ICHD-3 provides classification of headache disorders and diagnostic criteria for scientific, educational, and clinical use. We referred to the ICHD-3 criteria in developing this SSR.

We consider a person age 18 or older disabled if ... she is unable to engage in any substantial gainful activity due to any medically determinable physical or mental impairment(s) that can be expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than 12 months. In our sequential evaluation process, we determine whether a medically determinable physical or mental impairment is severe at step 2. A severe MDI or combination of MDIs significantly limits a person's physical or mental ability to do basic work activities. We require that the MDI(s) result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Our regulations further require that the MDI(s) be established by objective medical evidence from an acceptable medical source (AMS). We will not use a person's statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an MDI(s). We also will not make a finding of disability based on a person's statement of symptoms alone.

*Id.* (footnotes omitted).

SSR 19-4p explains how the SSA establishes a primary headache disorder as an MDI and how the SSA evaluates claims involving primary headache disorders:

### 1. What are primary headache disorders?

Headaches are complex neurological disorders involving recurring pain in the head, scalp, or neck. Headaches can occur in adults and children. The National Institute of Neurological Disorders and Stroke (NINDS), the American Academy of Neurology, and other professional organizations classify headaches as either primary or secondary headaches. Primary headaches occur independently and are not caused

31

by another medical condition. Secondary headaches are symptoms of another medical condition such as fever, infection, high blood pressure, stroke, or tumors.

Primary headache disorders are a collection of chronic headache illnesses characterized by repeated exacerbations of overactivity or dysfunction of pain-sensitive structures in the head. Examples of common primary headaches include migraines, tension-type headaches, and trigeminal autonomic cephalalgias. They are typically severe enough to require prescribed medication and sometimes warrant emergency department visits. The purpose of the emergency department care is to determine the correct headache diagnosis, exclude secondary causes of the headache (such as infection, mass-lesion, or hemorrhage), initiate acute therapy in appropriate cases, and provide referral to an appropriate healthcare provider for further care and management of the headaches.

Migraines are vascular headaches involving throbbing and pulsating pain caused by the activation of nerve fibers that reside within the wall of brain blood vessels traveling within the meninges (the three membranes covering the brain and spinal cord). There are two major types of migraine: Migraine with aura and migraine without aura. Migraine with aura is accompanied by visual, sensory, or other central nervous system symptoms. Migraine without aura is accompanied by nausea, vomiting, or photophobia (light sensitivity) and phonophobia (sound sensitivity). Migraine without aura is the most common form of migraine.

Tension-type headaches are characterized by pain or discomfort in the head, scalp, face, jaw, or neck, and are usually associated with muscle tightness in these areas. There are two types of tension-type headaches: episodic and chronic. Episodic tension-type headaches are further divided into infrequent episodic tension-type headaches, which typically do not require medical management, and frequent episodic tension-type headaches, which may require medical management. Chronic tension-type headaches generally evolve from episodic tension-type headaches. Chronic tension-type headaches and frequent episodic tension-type headaches may be disabling depending on the frequency of the headache attacks, type of accompanying symptoms, response to treatment, and functional limitations.

Trigeminal autonomic cephalalgias are characterized by unilateral (one-sided) pain. There are three types: cluster headache, paroxysmal hemicrania (rare), and short-lasting unilateral neuralgiform headache attacks with conjunctival injection and tearing (SUNCT; very rare). Cluster headaches are characterized by sudden headaches that occur in "clusters," are usually less frequent and shorter than migraine headaches, and may be mistaken for allergies because they often occur seasonally.

### 2. How does the medical community diagnose a primary headache disorder?

[P]hysicians diagnose a primary headache disorder only after excluding alternative medical and psychiatric causes of a person's symptoms. Physicians diagnose a primary headache disorder after reviewing a person's full medical and headache history and conducting a physical and neurological examination. It is helpful to a physician when a person keeps a "headache journal" to document when the headaches occur, how long they last, what symptoms are associated with the headaches, and other co-occurring environmental factors.

To rule out other medical conditions that may result in the same or similar symptoms, a physician may also conduct laboratory tests or imaging scans. For example, physicians may use magnetic resonance imaging (MRI) to rule out other possible causes of headaches—such as a tumor—meaning that an unremarkable MRI is consistent with a primary headache disorder diagnosis. Other tests used to exclude causes of headache symptoms include computed tomography (CT) scan of the head, CT angiography (CTA), blood chemistry and urinalysis, sinus x-ray, electroencephalogram (EEG), eye examination, and lumbar puncture. A scan may describe an incidental abnormal finding, which does not preclude the diagnosis of a primary headache disorder. While imaging may be useful in ruling out other possible causes of headache symptoms, it is not required for a primary headache disorder diagnosis.

…

### 7. How do we establish a primary headache disorder as an MDI?

We establish a primary headache disorder as an MDI by considering objective medical evidence (signs, laboratory findings, or both) from an AMS. We may establish only a primary headache disorder as an MDI.

33

We will not establish secondary headaches (for example, headache attributed to trauma or injury to the head or neck or to infection) as MDIs because secondary headaches are symptoms of another underlying medical condition. We evaluate the underlying medical condition as the MDI. Generally, successful treatment of the underlying condition will alleviate the secondary headaches.

We will not establish the existence of an MDI based only on a diagnosis or a statement of symptoms; however, we will consider the following combination of findings reported by an AMS when we establish a primary headache disorder as an MDI:

- A primary headache disorder diagnosis from an AMS. Other disorders have similar symptoms, signs, and laboratory findings. A diagnosis of one of the primary headache disorders by an AMS identifies the specific condition that is causing the person's symptoms. The evidence must document that the AMS who made the diagnosis reviewed the person's medical history, conducted a physical examination, and made the diagnosis of primary headache disorder only after excluding alternative medical and psychiatric causes of the person's symptoms. In addition, the treatment notes must be consistent with the diagnosis of a primary headache disorder.

- An observation of a typical headache event, and a detailed description of the event including all associated phenomena, by an AMS. During a physical examination, an AMS is often able to observe and document signs that co-occur prior to, during, and following the headache event. Examples of co-occurring observable signs include occasional tremors, problems concentrating or remembering, neck stiffness, dizziness, gait instability, skin flushing, nasal congestion or rhinorrhea (runny nose), puffy eyelid, forehead or facial sweating, pallor, constriction of the pupil, drooping of the upper eyelid, red eye, secretion of tears, and the need to be in a quiet or dark room during the examination. In the absence of direct observation of a typical headache event by an AMS, we may consider a third party observation of a typical headache event, and any co-occurring observable signs, when the third party's description of the event is documented by an AMS and consistent with the evidence in the case file.

34

- Remarkable or unremarkable findings on laboratory tests. We will make every reasonable effort to obtain the results of laboratory tests. We will not routinely purchase tests related to a person's headaches or allegations of headaches. We will not purchase imaging or other diagnostic or laboratory tests that are complex, may involve significant risk, or are invasive.

- Response to treatment. Medications and other medical interventions are generally tailored to a person's unique symptoms, predicted response, and risk of side effects. Examples of medications used to treat primary headache disorders include, but are not limited to, botulinum neurotoxin (Botox®), anticonvulsants, and antidepressants. We will consider whether the person's headache symptoms have improved, worsened, or remained stable despite treatment and consider medical opinions related to the person's physical strength and functional abilities. When evidence in the file from an AMS documents ongoing headaches that persist despite treatment, such findings may constitute medical signs that help to establish the presence of an MDI.

### 8. How do we evaluate an MDI of a primary headache disorder under the Listing of Impairments?

Primary headache disorder is not a listed impairment in the Listing of Impairments (listings); however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.

Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that ... her MDI(s) medically equals the listing.

Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: a detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory

35

symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

Paragraph D of listing 11.02 requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one area of functioning. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

### 9. How do we consider an MDI of a primary headache disorder in assessing a person's [RFC]?

If a person's primary headache disorder, alone or in combination with another impairment(s), does not medically equal a listing at step three of the sequential evaluation process, we assess the person's … RFC …. We must consider and discuss the limiting effects of all impairments and any related symptoms when assessing a person's RFC. …

We consider the extent to which the person's impairment-related symptoms are consistent with the evidence in the record. For example, symptoms of a primary headache disorder, such as photophobia, may cause a person to have difficulty sustaining attention and concentration. Consistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC.

Id. (footnotes omitted).

At step three of the five-step sequential evaluation process, the SSA determines whether the claimant has an impairment or combination of impairments meeting or medically equaling the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). In the Listing of Impairments, "for each of the major body systems," the SSA describes "impairments that [it] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." *Id.* §§ 404.1525(a), 416.925(a). The Listing of Impairments is structured to match the definition of "disability," which "includes two limiting elements: a definition of impairment and a severity requirement." *Randall v. Astrue*, 570 F.3d 651, 657 (5th Cir. 2009) (citing 42 U.S.C. § 423(d)(1)(A)). If a claimant's condition meets or equals an impairment in the Listing of Impairments, she is "conclusively presumed to be disabled and entitled to benefits." *Bowen v. City of New York*, 476 U.S. 467, 471 (1986).

In this case, at step three, the ALJ explained, "[Higgins] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments …. Although the undersigned found [her] to have severe physical impairments, the record offers little evidence demonstrating that they rise to the level of severity contemplated under any of the listed impairments[.]" Tr. 17. The ALJ expressly considered Listings 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root(s)), 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina), 11.14 (peripheral neuropathy), and 14.06 (undifferentiated and mixed

37

connective tissue disease). For the latter listing, after analyzing Higgins's FM diagnosis, the ALJ explained:

> [Dr. Daniel] diagnosed [Higgins] with hypermobility arthralgia/Ehlers-Danlos syndrome (Ex. 20F). Thus, the undersigned evaluated this condition under listing 14.06, undifferentiated and mixed connective tissue disease. However, [Higgins] does not have involvement of two or more organs/body systems, with: 1) one of the organs/body systems involved to at least a moderate level of severity; and 2) at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss); or repeated manifestations of undifferentiated or mixed connective tissue disease, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level: 1) limitation of activities of daily living, 2) limitation in maintaining social functioning, or 3) limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. For instance, despite diagnosing [Higgins] with hypermobility arthralgia/Ehlers-Danlos syndrome, Dr. Daniel reported that all 28 joints were normal and no pain with range of motion (Ex. 20F). [Higgins] displayed intact sensation, normal motor strength, and did not appear uncomfortable.

Tr. 18–19. The ALJ concluded, "Accordingly, the undersigned finds that [Higgins]'s impairments, considered individually or jointly, do not meet or equal a listing." Tr. 19.

As the Commissioner observes, although Higgins argues the ALJ erred at step three of the sequential evaluation process by failing to evaluate whether her FM medically equaled Listing 14.09 and whether her severe headache disorder medically equaled Listing 11.02, she neither states the requirements of those listings nor cites record evidence indicating she satisfies the requirements or medically equals the severity of the listings beyond her subjective complaints. *See* Doc. 23 at 23–25 (Higgins's brief); Doc. 25 at 8–9 (Commissioner's brief). The Court disagrees with the Commissioner's position

that Higgins failed to adequately brief this issue, *see* Doc. 25 at 10–11, but agrees with the Commissioner's position that Higgins shows no error. The ALJ's implicit rejection of the listings or their medical equivalence is clear from the ALJ's reasoning, as summarized in analyzing Higgins's first argument.

Higgins fails to show the ALJ erred at step three by failing to expressly evaluate whether her FM medically equaled Listing 14.09 and whether her severe headache disorder medically equaled Listing 11.02.

## III.   Conclusion

The Commissioner's final decision is **affirmed**. The clerk is directed to enter judgment for the Commissioner and against Melanie Higgins and close the file.

**Ordered** in Jacksonville, Florida, on September 27, 2024.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

39